Once again, I would like to say to begin with that it is a distinct honor and pleasure of mine to be able to address this esteemed court. Honorable judges of the Ninth Circuit, I believe that in this antitrust case, the court should be aware, and I'm sure it is, of the tremendous impact a decision in this case will have, should the court hold that an agreement among horizontal competitors, doctors in this case, professionals, to jointly negotiate, to collectively bargain with payers is not per se lawful. In other words, the district court held that such an agreement to collectively bargain among doctors was per se lawful. Just so I understand your argument, you want us on your wish list to hold that it is a per se violation of antitrust laws for physicians to negotiate on anything with payers. Is that correct? That is incorrect. Okay. Absolutely not. All right. If that's not correct, then what is the unlawful objective that you claim occurred in this case? The unlawful objective, your honor, was there was an agreement among the doctors to collectively bargain with health maintenance organizations over terms and conditions in the preferred provider agreement, and if those payers, those health maintenance organizations, did not agree to their various terms and conditions, to signal to their doctors, in this case, by a hit piece known as the alert, that they should not Well, Laura, I suppose there was a term and condition in there that, you know, all checks had to be cashed on Sunday. I mean, pick the silliest thing in the world, whatever it is. If I heard your answer just now, what you're really saying is the first question I ask, which is that what you collective bargaining over any term and condition of any plan is a person Why do I want to pinhole it like that, Judge? There's no reason to pinhole it like that. Well Let's say there's competitors You tell me I'm trying to, Judge You tell me what objective of the agreement in this case was unlawful. The unlawful objective was to jointly negotiate. They made an agreement to collectively bargain Well, there's nothing wrong with that, okay? Is there? Yes, absolutely Or am I not correct in saying that what you want us to hold is that any joint agreement to bargain I don't know why you want to pinhole it like that, Judge. I mean, if that's what you'd like to do, go right ahead No, I just want to find I suggest you don't look at the case. Let me explain, please, Your Honor, the case. We have a situation You don't want to answer my question, Mr. Aliotto. That's super. It's up to you I did, Your Honor. The answer is no. We're not saying that I'm trying to give you an opportunity to answer a concern that I have And I think my question is direct and simple Okay What is the unlawful objective that you contend these doctors agreed to accomplish? A restraint of trade by agreeing to collectively bargain with health maintenance organizations on economic terms and conditions under the Preferred Provider Agreement Which? Which terms? The economic terms Economic terms such as whether or not the fees paid are reasonable We had that on the March 21st, 1998 Are they bargaining over that or making any con... We're in the record Is there any indication of any agreement to discuss jointly fees? The March 21st, 1998 letter And where is that? It's the coalition on behalf of all of the organizations involved Where does it say it? Where does it say it in that letter? I believe it's on page 2 when it references paragraph Roman numeral 3 Where it says to HHN It's the letter of March 21st, 1998 Where HHN said put your concerns in writing And on page 2 of that agreement With respect to whether or not the fees set were reasonable Was a subject matter that the coalition wanted to discuss with HHN Which HHN then refused to discuss And then the hit letter of June 15th was sent out Signaling doctors not to sign That paragraph is where you get that conclusion from And there are others, there's another section Where they complain that in the HHN provider agreement HHN can pay a set fee If they think the fee charged by the doctor is not reasonable And they contest that They also contest... Didn't it say that any physician could? Did it say HHN? Or did it say any physician? What it said was HHN has a right to make a determination That the fee requested is not reasonable And that they can then pay that What they regarded to be the reasonable fee It says HHN can do that? Yes, and the doctors And let me be clear Your Honor I believe that doctors can get together It's too late in the day to say That horizontal competitors cannot talk to one another About some aspects of business Of course they can And Judge Kaczynski points that out In the Alston case But when you are saying That they can go beyond Informing the payer Let's stay with what the medical association The American Medical Association says In this case it's pro-competitive About the behavior involved When you inform the payer About his terms and conditions Of his PPA And you go back to your people And you tell them About the terms and conditions of the PPA You are making information More symmetrical And you are doing something That is pro-competitive But when you go beyond that When you go up to the payer And say as they did clearly With HMSA And attempted to do with us There is this provision Which we don't like And we want you to change it That is exactly what I believe The court in Maricopa County Medical Federation held Was a per se violation Because it was an economic term In this instance It were in fact economic terms That the group Of the coalition So called the Hawaii Medical Association And group of doctors Negotiated with HMSA That were economic terms And that HMSA Agreed to change Now that is the conduct For which the doctors in Austin Were criminally convicted That is what I am trying to get out from you Because it is tough At first blush To see where the negotiations Were over economic terms I don't think anybody in the room Quarrels with the assertion you just made If there were A joint agreement to negotiate Fees That is a very bad thing It is not just fees I was on the board of directors Of the Pacific Maritime Association And Harry Bridges and Jimmy Herman Used to talk about Economic and non-economic terms Of the agreement Obviously if we are talking about How many containers per hour you can put on a ship That is not really a non-economic term It is very economic To the payer And from the point of view of the health maintenance organization It is trying to Solve this problem Pointed out by the AMA This asymmetry of information That exists By As it were, policing On behalf of the patient The charges that are made By a doctor That is their role They are managing health care costs And some of these provisions Not all of them are directly on For example The right to arbitrate a decision Another example Indemnity Do the doctors indemnify the health maintenance organization With respect to Malpractice claims The record in this case Is very clear That with HMSA and with us The coalition sought to Bargain away that provision Well as any lawyer can tell you It is a non-economic term To talk about one's professional Liability insurance But when it comes time to pay the premium It is not so non-economic So if the health care maintenance organization Wants an indemnity from the doctor For malpractice claims If it is sued It wants to call back on the doctor To say you defend this action And the coalition is bargaining that With the health maintenance organization Then these organizations In the facts of this case Have gone too far Let me ask you a different question What is the evidence in the record That the HMA Had any Authority That is that there was an agreement That the association could Bargain for the individual physicians Who were members of it All right Let me say this The issue of agreement The evidence in the record Is that we were dealing with The duly constituted officers Of the HMSA The evidence in the record Is that we gave the court The minutes of the HMSA annual meeting And we put in the record The declaration of John Wan John Wan Who for 25 years Was the executive director Of the HMA Went through in his declaration How the executive committee Looked at what they were doing And decided that they would go ahead And join the coalition In this joint negotiation And he said We've got a lot of influence And we've got a lot of influence As far as their following along That's the hit piece I want to go back to the Pennsylvania dentist About that point Here's the point In Pennsylvania dental What the dentist did Was encourage their members Not to join Successful in some instances Not successful in others That's what we have in this case When HHN refused Now I'm not saying judge And I want to make it very clear I'm not saying this is a per se violation I was ready to put on a full rule of reason case But made an agreement That we could put this in front of the district court Because their position was It was per se lawful And the good district court judge Bought that lock, stock and barrel And she held in this opinion That it was per se lawful For horizontal competitors Doctors in this case To agree to jointly negotiate That's what they agreed to do Now they point out I can't pronounce the name The Shocklar case Judge Easterbrook And they say well there's no restraint We know We know from Standard Oil Any agreement Any agreement Is a restraint of trade It's only those that are unreasonable agreements Well here there was an agreement among the doctors It was an agreement To collectively bargain With health maintenance organizations Over terms and conditions In the preferred provider agreement And I go back To what I started out saying If you hold That that's per se lawful Then in the 11 western states, Alaska and Hawaii We're going to have a situation Where doctor groups Are going to in effect Act as Harry Bridges and the ILW Did with the PMA And bargain with them Now do they have the right to strike That's the SCTLA case The Supreme Court case Where the lawyers boycotted The District of Columbia Superior Courts In terms of the criminal Well no They don't boycott But what about job actions Our letters sent out On June 15th saying to all of the Doctors in the islands In the HMA 1650 doctors out of a total 2200 were dealing with 60% of the relevant market And they say HHN is a bad guy Don't do business with him And then we cannot sign up Any more providers That's a situation where they are As in the Pennsylvania Dental Association Actively Encouraging their members not to join Because the health maintenance Organization refuses to collectively Bargain I would reserve what time I have left for rebuttal It looks like I have about 6 minutes left Thank you Who's on On first first Mr. Propofsky I'm elected your honor My name is Larry Propofsky On behalf of the HMA My colleagues will Produce a medical Effect If I do not reserve for them time 3 minutes each For the coalition And for The Queens Practice Group Well let me first of all Say that this is not a Holding blow of a per se anything It is a summary judgment That there is no triable issue of fact Classic decision under the rule of Reason It was the great professor Who said sometimes the rule of reason Can be applied With a twinkling in the eye That one need not Always have a trial Under the rule of reason And the question becomes whether There is anything in this record That suggests a Unlawful purpose in what Anybody did among the physicians So let us turn then To what the record is The conduct First of all There is absolutely no discussion About anything That is price No price schedules No price levels No nothing Well Mr. Alioto points to You know Paragraph 3 He points to Talking about arbitrating He talks about Talking about indemnity For malpractice insurance And I believe he pointed to To one other provision In the agreement Why do you disagree That those provisions Relate to an economic Term Well he has me at an advantage I never met Harry Bridges In his experience Let's cross that bridge We'll pass that bridge Let me focus on What this phrase Economic term means It's not an unfamiliar One in vertical Situations for example Vertical restraint situations We draw a very clear line in the law Between price fixing Price setting Price agreements Price negotiations And non-price terms Which inevitably have some Economic consequences Indeed any non-price term Can have an economic consequence So the question becomes How close is this Really to anything That one would fairly describe as price And if you look at it What you're talking about is a letter An initial letter from the coalition Not from the HMA but from the coalition But it doesn't matter for these purposes Saying we would like to raise some Questions with you About A the reimbursement Rates Because there's nothing in here that suggests That there is a standard like Fair and reasonable There is nothing in here that suggests costs Of physicians will be taken into account There is nothing here suggesting That there is a right To appeal Within your procedures And we would like to discuss those with you That's all That and nothing more There are a number of other Non-economic terms In fact at 177 Of the record there is a letter This is the supposedly Coercive letter that the HMA sent Sent to the insurer With the contract Marked up The contract marked up and said here are the things We'd like to talk about Now was there an agreement Yes absolutely there's an agreement There's an agreement in the sense that The association authorizes Its executives To sit down first with the Blue Cross Carrier in Hawaii The dominant carrier HMSA Which they did They sat down with them and they talked Several provider groups did And the HMSA Took some of the suggestions And rejected others There was no boycott There was no resolution Don't do business with Blue Cross In the state of Hawaii All that happened was An exchange of ideas About what is or is not good practice Given the medical crisis In Hawaii and in this country Oh yeah but there's a fine line Between discussing ideas about Policy underlying Health provision healthcare And Discussing A provision That really does Have to do with the Economics of medical practice It's All provisions in the contract For the provider have something to do with Economics of medical practice Presumably if Alston is correct It's okay to talk about some of them That's correct But it's pretty clear that you can't cross over the line So why is it so clear Here that the line wasn't crossed over Particularly with respect to the provisions That Mr. Alliott mentioned First of all There's no dispute in this record As to what was and what was not Proposed for discussion Recall the plaintiff here Never chose to discuss And the only communication Ever made out to the doctors About this particular plan Was that they declined to talk About anything That is unquestioned And there is no suggestion In the evidence at least That there was any impact in reality Over that communication To members in terms of their Refusing to sign or anything else But going now specifically To your honors question The paragraph that I just Referred to is a list of items And a few of them Which the Doctors wanted to At least discuss They're not about fee levels They're not about fee Prices What's going to be paid to a doctor For a provision of service What they are are Concerns about safeguards In the mechanism Which set price on the one hand And concerns about The absence of appeal If the provider believes that the Compensation was too low Those are not price fixing Terms They're not price fixing terms by any definition They are economic terms In the broad sense Because I suppose having a right to Appeal in some sense A fee because we think it's too low Can affect fees But that's not price fixing That is the kind of provision And they're all absolutely Set forth in this record Which are uniformly across the United States Discussed by Providers Associations with carriers Now what Really sets this apart Is you can Discuss these things You can't do anything more And there's no suggestion Anything more was done There's no boycott There's no threat There is no I assume that When you represent 60% of the Physicians in Hawaii And you have a lot of influence Over them there is an implied threat Of withdrawal Or refusing to deal Or something Which I would be interested in your response to But he also more specifically Seemed to extract Out of the communication A proposal To have Reimbursement Negotiated by the Association No there is nothing in there suggesting The reimbursement levels were to be Set by the association If you look in his briefs he doesn't suggest that This by the way is the only provision In anything in which price Was even talked about But there is no suggestion that the Association wanted to talk about Price in fact his Clients in depots conceded That price was never discussed The idea that this provision Has something to do With price was not initially Raised by his Client at all It was only on looking back at it And looking back at it they thought Maybe it has something to do with price There is another one about price he hadn't mentioned Which is that any Price schedules which the insurer Wants to put into effect Should wait for 30 days That was proposed for discussion What's Striking is That the associations did nothing More than want To discuss whether or not These mechanisms and all these Other terms which are marked So carefully in exhibit 177 the record 177 In the accompanying letter Whether they are or are Not good practice there is no Suggestion that they have to be Accepted HMSA the prior Organization the monopolist if you will In Hawaii did not accept all the suggestions There was no boycott There was no threat there was no Influence I suppose the association Has to have an influence or it wouldn't exist I mean that is almost Paralogical but that was true in soccer As well It was a Product Qualification kind of conduct In which the association Said this procedure is Purely labeled Properly labeled as experimental And the plaintiffs said Oh my god that hurt us That hurt us bad And judge Easterbrook could not even begin To find anything about that Conduct that raised a serious question And he observed specifically That influence Is what associations Are supposed to have But that is a very different thing On whether it constitutes a threat A boycott Any enforcement Mechanism at all and there is no suggestion There is there are no resolutions Passed there was no effort to Even find out At the association who Had signed a contract with the plaintiffs Among the association members There is no evidence In this record of any Real world Impact over the Suggestion by these Organizations that they would like to sit Down with the plan And talk about their terms It didn't happen nothing happened They took the position The purest position that Mr. Alioto Espoused and that is You cannot collectively You cannot collectively Come to us and say We'd like to talk about the terms of our Provider agreement Now in policy terms It would be I think fundamentally wrong For the antitrust Laws to say Gee these associations can't do That under threat of antitrust violation Holding under the rule of reason Provider Organizations ought to have The benefit of the experience The history The collective wisdom that can be reposed In an association's Leadership in terms of Trying to inform The marketplace The plans on the one hand the doctors on the other What they think is good practice If that's all they do If they go no further than The good housekeeping Stamp of approval on that Particular contract term In that particular contract We never even got there Here nothing happened The plaintiffs took the Position without Telling anybody tape recording A telephone conversation And then bringing litigation without Even responding To the markup Of the contract they took the position You just can't talk to us collectively That that is and I think this is Where Mr. Bridges may have something To say to us that is the Equivalent of collective Bargaining in the labor context Where as we know the union members Are bound and it's an entirely Different ball game here the providers aren't Bound by anything There's no threat that the Providers will or will not follow The recommendations of the Association on this record What happened was that they Announced their plan Initially 100 doctors signed up before The HMA did anything Eventually they bought the Provider agreement assignments From a failed Insurance plan another 200 Were brought into the fold that way They ended up having over 300 before the association Did anything in Communicating to its members And what did it communicate to its members The alert This is the one Communication to members And that alert said You know This plan declines To talk to us Moreover they have taken assignments Of this failed bankrupt Predecessor which Caused an awful lot of Agony in the state of Hawaii And there's some concern about that And how that assignment Works and its impact on Doctors that by the way has Economic impact and We've talked to the commissioner We've talked to the commissioner about These kinds of problems And you know what the commissioner said There are real genuine Concerns here the commissioner of insurance Not only that But that communication Was shown to the commissioner of Insurance before it was Sent edited And approved for Dissemination Now that is the Coercive use If I may of the Authority and Power of the association That and nothing more And now I have to leave Thank you Thank you Mr. Castillo Good morning I'm Rafael Del Castillo And I represent three of the defendants here The Hawaii Coalition for Health Dr. Arlene Myers, its President and founder and Dr. Peter Locatelli, its vice president And co-founder The coalition is recognized by this state as the healthcare consumer advocacy organization in Hawaii I don't want to let Mr. Alioto get away with labeling the coalition a position organization because it is essential in many respects to what is going on in this case The coalition is in this case because at issue between plaintiffs and the coalition were contractual disincentives to providing care Those were the disincentives that the coalition raised in the March 21 letter that Mr. Alioto pointed to. Every one of those concerns indicates that it is a consumer based concern and that was the coalition's position on those concerns It is entirely lawful for a healthcare consumer advocacy organization to attempt to persuade plans to change the terms in their plans and to communicate with their members the progress of those efforts and with the general public about those same about those same efforts What plaintiff's complaint has tended to do in this case, and if you rule that this case must go back to trial against the coalition is chill debate that was raising consumer awareness and promoting a more competitive environment The concerns that plaintiff raised that embarrassed them were due to their poor execution and not the truth that the coalition helped publicize The coalition's criticisms of plaintiff's contracts and of the way in which they attempted to use the bankrupt insurance company's provider network were valid and fair and pro-competitive The fact that physicians tend to pay attention to the coalition's opinions does not reduce its right and its freedom to speak out on those issues Mr. Aliotto's label notwithstanding the coalition's position on each of the matters in this case and the issues that it raised in the public and with physicians concerned valid consumer issues in their contracts and in their health plan The district court therefore correctly found that the coalition is a consumer advocacy organization and dismissed all plaintiff's claims against the coalition defendants and we ask this court to affirm that decision Okay, thank you Any questions? I think not. Mr. Roach? May it please the court My name's Tom Rush and I represent the QPG defendants, that is to say the Queens Physician Group and Doctors Lockwood Young and John Bruet who were members of the group's executive board Your Honor Affirmance of the summary judgment in favor of these three QPG defendants raises no doctrinal issues at all It's simply based on the record and I speak separately for these three defendants because they have a different basis for summary judgment. Namely in this instance the plaintiffs admitted that none of the three QPG defendants was a party to anything about which the plaintiffs complained Those admissions are contained in plaintiffs' responses to our statements of undisputed fact numbers 33 through 41 Those statements are located at pages 7 and 8 of our record excerpts and plaintiffs' admissions that those facts are undisputed including I might say the hit letter facts are located at pages 380 of our record excerpts and I invite the Court's attention to those pages More specifically the plaintiffs admitted there with respect to the QPG defendants first that none of those defendants participated in any effort to change plaintiffs' provider agreement including the telephone conferences and meetings that the Coalition and HMA had about plaintiffs' provider agreement. That's their admission Second they admit that none of the QPG defendants had any discussions with anyone from the Coalition or HMA about the fees that plaintiffs proposed to pay to physicians or about that's their admission and third they admitted that none of the three QPG defendants participated in preparing any of the HMA or Coalition communications to their members about which plaintiffs complained including the alert or so-called hit letter and that none of those communications were signed by the QPG defendants or mentioned them and I'd just like to conclude, Your Honor by saying this about the so-called Wan Declaration that declaration does not so much as mention Dr. Droulet or Dr. Young and its reference to QPG is both conclusory and rank hearsay as we asserted below and our objections are located at page 520 of our record excerpts and as the District Court found at page 371 of the appellant's excerpts of the record Thank you, Your Honor Mr. Leone In the time left to the appellant, let me point two things out about the record I don't happen to have the opening brief at page 13 the March 21st, 1998 letter at page 2 said in connection with the HHN agreement, quote, there is no assurance under paragraph Roman numeral 3A and under the reimbursement rates established in attachment A attachment A to the preferred provider agreement, may it please the court, were the rates and under reimbursement rates established in attachment A paragraphs 1A and 1B that the reimbursement rates will be fair or reasonable or that they will take the provider's costs of providing the services into account. Worse yet not only is there no provision for an appeal of the reimbursement rate on the question of its adequacy or fairness but Roman numeral 3A gives failure to accept replacement reimbursement methodologies as grounds for termination of the agreement. What is anti-competitive about that? What's anti-competitive about that, your honor, is that today's reasonable price is tomorrow's unreasonable price. What they're saying is you have to have something in your preferred payer of insurance, you representing the patient, you have to have in your contract a provision that  must be fair and reasonable. Sometimes the fact of the matter is, your honor in our economy, rates that are paid aren't fair and reasonable, but they are market rates. Sometimes a market rate is below the cost of the provider's cost of providing it. And if he's the inefficient indeed, let me quote the recent Freeman case, Judge Kaczynski said that on the road to free competition it contemplates that there will be roadkill. Now that's out of the Freeman case and Judge Kaczynski's argument very recently made. So they have no right to come to us and say either you will negotiate and make your PPA put in their reasonable rates or we'll put you out. In the record, your honor, at excerpt 235 is a letter dated December 17, 1997 on HMA stationary sent to the Hawaii physicians, member 1675 of them. And they pointed out that they got HMSA to change the following provisions. One, the whole harmless cause which may have made the physician liable for expenses that are not covered by medical malpractice insurance policies was removed. We therefore are not responsible for indemnifying HMSA. That's a money term. Two, the section that permitted HMSA to quote, pay the eligible charge for the lower cost service or supply rather than the service or supply proposed or furnished by the participating physician was eliminated. That's a key provision and that's one they fought us on. In other words, that says if your rate is out of whack with the local community, we're going to pay the local community rate. And so they got that eliminated. The distinction between medical necessity and covered service was more clearly defined and so forth. So they were talking about terms and conditions, economic terms and conditions. Secondly, as far as the boycott is concerned, there is, counsel is correct, there is no explicit boycott. What there is is the alert piece which says, just as there was in Pennsylvania Dental, encouraging the doctors not to sign. And we showed in the John Wan Declaration where they talked about not to sign. Counsel says where's the real world impact? The fact of the matter is that in this relevant market there is only one health maintenance organization. HMSA has 90% of the market. Because of this conduct they knocked HHN out of the market and we would have otherwise been competing in this market. Because the market is the market for the buck in the pocket of the employer who pays for the health care of his employee. And that employer has only one HMO to deal with in this entire relevant market. It has had real world impact. Next, asymmetry of information. The good housekeeping seal of approval. There is no doubt. I want to concede that very clearly. But it's no place for summary judgment. That the medical organization has a right to look over the PPA and tell its members what it thinks. And it has a right to tell that same information to the payer. And that's where asymmetry of information stops. The coalition, Mr. Del Cossio eloquently argues for them that this is part of a debate about the level of patient care. They have a perfect right to talk about the level of patient care. But they don't have a right to go to the payer and say, either you take that provision out about how you have to pay the reasonable price for this procedure, or we're going to not sign up with you. In summary, let me say that Why is QPG still in the case? Yes, let me say that. QPG is a signatory to these letters. QPG signed the letter that is found in the record at 238. They joined the group of Collected Bargaining Group, and then the coalition, Ms. Myers, was the representative in dealing with HHN. And she wrote letters saying, we're representing these groups. And they never withdrew. It's true what counsel says. They did not participate in the piece of collectively bargaining with HHN, my client. But what they did do is they joined the group, bargained with HMSA, and let the coalition go out and say they represented them, and at no point withdrew from the conspiracy. And what's the conspiracy recombination? An agreement to jointly bargain, collectively bargain over terms and conditions of a preferred provider agreement. I appreciate the time and patience of this most esteemed court. Okay, counsel. Thank you. I appreciate the argument in this matter. And the matter just argued will be submitted. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Goodwin, Rymer, T.G. Nelson